2008 WL 8920318
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Gale MUCCI, Plaintiff,
v.
ST. MARY'S HOSPITAL, INC., Defendant.

Civil No. 3:06CV1135 (AVC).
|
Sept. 22, 2008.

**Attorneys and Law Firms**

Deborah L. McKenna, Stephanie M. Marnin, Outten & Golden, Stamford, CT, for Plaintiff.

James F. Shea, Tasos C. Paindiris, Jackson Lewis, Hartford, CT, for Defendant.

## RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ALFRED V. COVELLO, District Judge.

*1 This is an action for damages, attorney's fees, and equitable relief involving alleged age discrimination and retaliation with respect to the defendant's termination of and failure to re-hire the plaintiff. It is brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et. seq. ("ADEA"), the Federal Family and Medical Leave Act, 29 U.S.C. § 2612 et. seq. ("FMLA"), and the Connecticut Fair Employment Practices Act, C.G.S. § 46a–60 et. seq. ("CFEPA").

In her five-count complaint, the plaintiff, Gale Mucci, alleges that the defendant, her former employer, St. Mary's Hospital ("St.Mary's"), subjected her to adverse employment action because of her age and retaliated against her for taking an approved medical leave of absence and for making both informal and formal complaints of age discrimination.

St. Mary's has filed the within motion for summary judgment arguing that there is no genuine issue of material fact with respect to any of the five claims and is entitled to judgment as a matter of law.

In response, Mucci argues that there are genuine issues of material fact from which a jury could conclude that St. Mary's conduct constitutes unlawful discrimination and, therefore, the motion for summary judgment should be denied in its entirety.

The issues are 1) whether there is sufficient evidence to raise a genuine issue of material fact with respect to Mucci's FMLA claims 2) whether there is sufficient evidence to raise a genuine issue of material fact with respect to Mucci's ADEA and CFEPA retaliation claims; and 3) whether there is sufficient evidence to raise a genuine issue of material fact with respect to Mucci's ADEA and CFEPA age discrimination claims.

For the reasons hereinafter set forth, the motion for summary judgment is GRANTED in part and DENIED in part.

*Facts*

Examination of the complaint, pleadings, Local Rule 56(a) statements, and exhibits accompanying the motion for summary judgment discloses the following undisputed material facts:

The defendant, Saint Mary's Hospital, located in Waterbury, Connecticut, is a not-for-profit, general acute teaching hospital. Eleven in-patient nursing units are located within St. Mary's. During the relevant time, Janet Weber was the Xavier 3 unit Nursing Director. Janice Brown was Nursing Director of the units, Sacred Heart 5 and O'Brien 4. Paula Bowley was Nursing Director of the telemetry/critical care unit. Lastly, Claudette Conran was Nursing Director of O'Brien 1, the psychiatric unit.

The plaintiff, Gale Mucci, born on April 6, 1953, was 50 years old at the time of her termination.[1] In 1978, St. Mary's hired Mucci, at the age of 25, as a "nurse's aide". In 1987, St. Mary's hired Mucci for a night-shift "clinical unit clerk" position. During her time as a unit clerk, Janice Brown was her supervisor. In 1998, while continuing to work at St. Mary's, Mucci started at the Bridgeport School of Nursing to earn her nursing degree. In 2000, Mucci graduated from the Bridgeport Hospital School of Nursing. In 2001, she obtained her registered nurse (RN) license from the State of Connecticut after

passing her Connecticut Nursing Exam. In the summer of 2001, St. Mary's hired [2] Mucci, at the age of 46, as a registered nurse on the Xavier 3 unit, for the night-shift, about 11:00 pm to 7:00 a.m. Mucci held this position for the next three and a half years.

*2 On September 9, 2004, Mucci was injured in a motor vehicle accident.[3] St. Mary's granted Mucci unpaid medical leave under its Family Medical Leave policy to begin on September 16, 2004. Mucci's initial expectation was to return to work on October 5, 2004, from the approved leave. However, she extended her leave once to November 18, 2004, and a second time to January 9, 2005. Mucci received the full 16 weeks of statutorily protected leave from September 14, 2004 to January 9, 2005. On January 9, 2005, upon expiration of her leave term, Mucci was automatically placed in "neutral absence status".[4] The parties disagree as to the correct interpretation and application of the neutral status policy[5] with respect whether neutral applicants are considered external or internal applicants.[6]

On January 21, 2005, eleven days after her FMLA leave expired, Mucci's own physician medically cleared her to return to work and on January 25, 2005, St. Mary's Occupational Health Department medically cleared her to return to work.[7] Both doctors cleared her to return to work without any restrictions. No one at St. Mary's ever told Mucci that they considered her injuries to be a liability to the hospital.

On January 26, 2005, Mucci went to the St. Mary's human resources department and applied for her former position in person. She applied for her former position as an internal applicant based on a conversation with John Jenusaitis a day earlier. On January 27, 2005 Nancy Miko[8], St. Mary's Clinical Recruiter, called and informed Mucci that she was not an "in-house" applicant; rather, she was considered an outside (external) applicant. Mucci then faxed an external application for her former position on Xavier 3 to the Recruitment Resource Center that day.

On January 28, 2005, Mucci called Janet Weber to inform her that she had applied both internally and externally for her former position. Weber told Mucci that she had already offered the position to another applicant. The parties dispute whether correct protocol was followed in the hiring of Mucci's replacement,[9] Kathleen Poholirak, who was born on September 22, 1970, and, therefore, was thirty four years old when she was hired as the plaintiff's replacement. Poholirak, a 2004 nursing graduate, had recently started working at St. Mary's on Sacred Heart 5 and applied for the Xavier 3 position via a transfer request.

Mucci states that, "she applied for all open positions for which she believed she was qualified from January 26, 2005 through June 18, 2005." Despite 16 applications,[10] Mucci was not re-hired. Mucci points out that she was also not interviewed for any of the positions. According to Nancy Miko, of the nurses hired for the 16 positions, three were over the age of 40.

On March 7, 2005, Mucci accepted a nursing position at Waterbury Hospital where she remains employed. On September 19, 2005, St. Mary's officially terminated Mucci's employment.[11]

*3 Mucci alleges that her "termination [from St. Mary's] transformed [her] from a highly functioning and engaged spouse, parent, and individual to a person who suffered from anxiety and depression, to the point that she could barely drive past St. Mary's hospital without becoming emotional."

## STANDARD

The court appropriately grants summary judgment when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991), *cert. denied*, 502 U.S. 849 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims ... [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).

## Discussion

The plaintiff asserts claims of retaliation and age discrimination under the FMLA, ADEA, and CFEPA. On a motion for summary judgment, all of these claims are subject to the McDonnell–Douglas three-part burden-shifting standard where the plaintiff must establish a prima facie case of discrimination or retaliation and then provide evidence to support a finding of pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### I. Prima Facie Case

A. *Retaliation Under the FMLA* [12]

Mucci asserts a claim of retaliation for exercising her rights under the FMLA, that is, but for taking the FMLA leave she would not have lost her job on Xavier 3, or would have been hired to another position.

Under the *McDonnell–Douglas* framework, a plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of retaliation. See *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir.2004); see also *Sista v. CDC IXIS North America, Inc.*, 445 F.3d 161, 176 (2d Cir.2006).

To establish a prima facie case, the plaintiff must show that "1) [she] exercised rights protected under the FMLA; 2)[she] was qualified for her position 3)[she] suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168.

*4 The parties do not dispute that the first three elements of Mucci's prima facie case are satisfied. Therefore, the issue turns on whether the fourth element is satisfied. Namely, whether St. Mary's termination of Mucci gives rise to an inference of retaliatory intent with respect to her FMLA leave. This is also referred to as the "causal connection" prong of the plaintiff's prima facie case.

St. Mary's argues that Mucci fails to establish a FMLA retaliation claim. Specifically, St. Mary's argues that Mucci "cannot establish an inference of retaliatory intent".

In response, Mucci argues that she has met all four elements of her prima facie claim. Specifically, she argues that her circumstantial evidence of temporal proximity, inter alia, "give[s] rise to an inference of retaliatory intent."

The court concludes that Mucci's circumstantial evidence does satisfy the causal connection element and thus, she establishes a prima facie case of retaliation under the FMLA.

"In this circuit, a plaintiff can indirectly establish a causal connection to support a ... retaliation claim by showing the protected activity was closely followed in time by the adverse [employment] action." *Gorman–Bakos v. Cornell Co-op Extension of Schenectady*, 252 F.3d 545, 554 (2d. Cir.2001) (citations omitted) (internal quotation marks omitted) (finding that the passage of up to five months between the claim and the adverse action is "strong enough to survive a summary judgment motion"); *see also Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir.1980) (finding that an 8 month gap between EEOC complaint and retaliatory action suggested a causal relationship).

Mucci's FMLA leave expired on January 9, 2005. She applied for several RN positions over the next six months and was officially terminated on September 19, 2005. Indeed, Mucci's rejected applications (the last one submitted on June 13, 2005) and her termination in September closely follow the expiration of her FMLA leave. This temporal proximity creates a genuine issue of material fact as to whether the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.

B. *Retaliation Under the ADEA and CFEPA* [13]

The ADEA makes it unlawful for an employer to discriminate against an employee for opposing any unlawful employment practice or for charging, testifying, assisting, or participating in an investigation, proceeding,

or litigation authorized under the ADEA. *29 U.S.C.A. § 623.*

Again, under the *McDonnell–Douglas* burden-shifting framework, the plaintiff must first establish a prima facie case of retaliation. *See Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 94 (2d Cir.2001). First, the plaintiff must show by a preponderance of the evidence: 1) participation in a protected activity known to the defendant; 2) an employment action disadvantaging the plaintiff; and 3) a causal connection between the protected activity and the adverse employment action. *Slattery,* 248 F.3d at 94. (citation omitted)(internal quotation marks omitted). At this stage, the plaintiff's burden is minimal or *de minimis. Id.*

*5 St. Mary's argues that "based on the [timing of Mucci's] filing of her administrative charge with the CHRO and EEOC," Mucci cannot prevail on her ADEA and CFEPA retaliation claims.[14] Specifically, St. Mary's first argues that Mucci cannot satisfy the first and second prongs of her prima facie case because 1) "no evidence exists that [nursing directors, Brown, Weber, and Bowley], knew of her protected conduct or that they retaliated against [Mucci]," and 2) when the sole basis for the retaliation claim is timing and "gradual adverse job actions" began before the plaintiff made her complaints, then an inference of retaliation is precluded.

In response, Mucci argues that she has "put forth sufficient evidence of retaliation" showing "there are material issues of fact precluding summary judgment." Specifically, Mucci argues that "a reasonable jury could find that [St. Mary's] retaliated against [her] for her age discrimination complaints by failing to investigate her complaints, thwarting her efforts to use the internal grievance process, and ultimately preventing her from obtaining full-time active employment status and terminating her employment."

The court concludes that the plaintiff has alleged sufficient facts to make out a prima facie case of age-based retaliation.

A showing of individual awareness on behalf of nursing directors, Brown, Weber, and Bowley, is not required. *See Gordon v. New York City Bd. Of Educ.,* 232 F.3d 111, 116 (2d Cir.2000) (stating that "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."); *see also Reed v. A.W. Lawrence & Co. Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996) (finding the knowledge requirement "easily proved" because the corporate entity was aware of plaintiff's complaints).[15]

As previously noted, "temporal proximity can demonstrate a causal nexus." *Slattery,* 248 F.3d at 95; *see Cifra v. GE Co.,* 252 F.3d 205, 217 (2d Cir.2001) (stating that "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (internal citations omitted)). However, "when timing is the only basis for a claim of retaliation and gradual averse job actions began well before the plaintiff ever engaged in a protected activity, an inference of retaliation does not arise." *Milde v. The Housing Authority of the Town of Greenwich et al.,* 2005 U.S. Dist. LEXIS 434701, 41 (quoting *Slattery,* 248 F.3d at 95).

Mucci first made an informal complaint on February 22, 2005, to Diane Gaborc and then formally served St. Mary's with her CHRO and EEOC complaint on or about May 23, 2005. She was terminated on September 19, 2005. About seven months transpired between her initial informal complaint and her termination. There were no documented adverse actions while Mucci was an RN.[16] The court concludes that Mucci's termination was sufficiently close in time to her complaints of discrimination to raise an issue with respect to causation for purposes of her prima facie case of retaliation.

C. *Age Discrimination Claims (ADEA and CFEPA)*
*6 The ADEA makes it "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). The protected class is limited to persons 40 years of age or older. *See id.* at § 631.

Because Mucci offers no direct evidence of discriminatory treatment based on age, both her ADEA and CFEPA claims are reviewed under the familiar *McDonnell–Douglas* framework, starting with the prima facie case. *See Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 n. 1 (2d Cir.2005).

First, the plaintiff must establish a prima facie age discrimination case by demonstrating that: "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under conditions giving rise to an inference of discrimination...." *Id.* (internal quotation marks omitted) (citations omitted). Plaintiff's prima facie burden is again *de minimis*. *Id.*

St. Mary's argues that Mucci offers no direct or circumstantial evidence that suggests discrimination based upon her age. Specifically, St. Mary's argues that because Mucci was hired as an RN at an age within the protected class, that some hiring directors were within the age of the protected class, and that some of the people hired for the 16 positions were within the age of the protected class, there is no support for an inference of discrimination.

In response, Mucci argues that her "termination occurred under circumstances that give rise to an inference of discrimination." Specifically, she argues that she is long-time employee in "good standing" subject to the defendant's "desire for a younger nursing staff" at a workplace faced with an "aging nursing population[ ]." She focuses on the testimony of Nancy Miko.

The parties do not dispute that the first three prongs of the prima facie case are satisfied. The analysis thus turns on whether the fourth prong, inference of discrimination, is satisfied. The court concludes that the evidence does create such an inference.

"The far more reliable indicator of age discrimination is the age discrepancy between the discharged employee and her replacement." *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 78 (2d Cir.2005) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)). "Thus, it is that discrepancy as to which an employer must have some knowledge to support an inference of discriminatory intent." *Id.* at 78.

With respect to Mucci's application for her former position on Xavier 3, a recent graduate, Kathy Pohorilak, replaced Mucci. Pohorilak was 15 years younger than Mucci at the relevant time of her transfer to Xavier 3.

Recruiting Coordinator, Nancy Miko, testified, "of all the positions Mucci applied for 3 people hired were over the age of 40." The court concludes that this evidence is sufficient, at this prima facie stage, to give rise to an inference of age discrimination. Therefore, Mucci has established her prima facie case of age discrimination.

II. Pretext

*7 In accordance with the *McDonnell–Douglas* framework, the final burden-shift falls on the plaintiff to show that the defendant's proffered non-discriminatory legitimate reasons for its adverse employment actions were merely a pretext for discrimination.[17] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Because the pretext analysis is the same for all of Mucci's claims, the court will address her claims together with respect to this final burden-shift.

St. Mary's argues that even if a prima facie case is established, Mucci fails to provide sufficient facts to raise an issue of pretext because she "has no evidence [that the hospital's articulated reasons are] false" and "cannot refute [its] legitimate business reasons for its selection decisions," and therefore is entitled to summary judgment.

Mucci makes various arguments that St. Mary's proffered reasons are mere pretext. Specifically, she argues that, 1) she was well qualified for the RN positions to which she applied and as a previously successful RN on Xavier 3, it is "implausible" that she was not re-hired; 2) the discriminatory belief that "you can't teach an old dog new tricks" underlies one nursing director's hiring rationale; and 3) there is direct animus indicated in Nancy Miko's testimony. Mucci further adds that pretext is evidenced by St. Mary's portrayal of her termination as a rote result of the application St. Mary's neutral absence policy and a review of the evidence that St. Mary's provides in support of its legitimate business reasons.

"On a motion for summary judgment ... [the] plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely as pretext for impermissible retaliation." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 n. 5 (2d Cir.1998). The plaintiff must show that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 148 (2000)(holding that the "plaintiff's prima facie

case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). The plaintiff does not have to prove the falsity of the defendant's proffered reasons. *Bickerstaff v. Vassar College*, 196 F.3d 435, 447 (2d Cir.1999).

St. Mary's proffered reasons are addressed as follows:

1) *Janice Weber, Nursing Director of Xavier 3*
St. Mary's argues that "Ms. Weber viewed [Mucci] as an average nurse and that she found [Mucci's] interpersonal and performance skills to be lacking." However, on the St. Mary's "Performance Appraisal" dated December 31, 2003, and signed by both Mucci and Weber, Weber checked that Mucci "Meets Standard" in all forty-three subcategories of seven "Key Result Areas" on the appraisal.[18] Weber did write additional comments on the appraisal including "still at the novice practice level." Yet, Weber testified that, with respect to her decision on Mucci's application for her old position on Xavior 3, "[performance] didn't come into play at all. It was purely internal versus external."

2) *Janice Brown, Nursing Director of Sacred Heart 5 and O'Brien 4*
*8 St. Mary's states that Brown did not want to hire Mucci based on Mucci's previous performance as unit clerical worker in the 1990s when Brown was her supervisor. Specifically, the defendant states that Brown "had ample opportunity to observe [Mucci as a unit clerk] and filed two complaints about [Mucci's work]. Brown thought Mucci was "slow, lacked initiative and was not assertive." However, Brown's comments refer to when Mucci held a clerical position in the 1990s, about a decade prior to her working as a nurse. In her affidavit, Brown also states that her decision "was not in any way based upon [Mucci's] age, but was strictly based upon [her] personal interaction with Ms. Mucci, [her] observations of [Mucci], and [her] experiences with [Mucci]," thus admitting that part of her hiring decision was based on personal interactions rather than work performance.

2) *Paula Bowley, Nursing Director of Patient Care Services for Critical Care, Telemetry & Cardiovascular Care*

St. Mary's asserts that Bowley did not want to hire Mucci because of the nature of the work done on Bowley's unit. Specifically, in her affidavit, Bowley states that she had a "hiring preference of only hiring nurses with strong telemetry and critical care or cardiovascular experience, or alternatively, those new graduate nurses whom I could train in the style and manner in which I wanted them to perform."

Bowley's statement that she requires specific experience could stand alone as a sufficient legitimate reason and would be difficult for Mucci to contend as pretext. However, Bowley's legitimate nondiscriminatory basis does not stop there. Rather, she continues that in the alternative she prefers new graduates because, 1) she can train them to her liking and 2) they are "best suited for the very fast paced environments of these particular units." Bowley suggests 1) that only new graduates can grasp her specific method of training and 2) that only new graduates are able to handle the pace of the floors. By making such hiring generalizations, Bowley is not considering each applicant's actual skill and ability. Also, about three years separate Mucci's hiring as a new graduate RN and her application to Bowley's floor in 2005.

The court concludes there are sufficient facts here to create a genuine issue of material fact with respect to whether St. Mary's proffered reasons for rejecting Mucci's applications and for terminating Mucci's employment were pretext for unlawful discrimination.

With respect to Mucci's application for a position available on O'Brien 1, however, the court concludes that Mucci has failed to prove that St. Mary's legitimate reason was a pretext for illegal discrimination. Mucci provides no evidence that the proffered reason, her lack of experience on the psychiatric unit, was pretext for discrimination.

Because Mucci has established a prima facie case for all of her claims and has created a genuine issue of material fact as to pretext, the motions for summary judgment with respect to the claim of FMLA retaliation, the claim of retaliation under the ADEA and CFEPA, and the claim of age discrimination under the ADEA and CFEPA are denied.

*CONCLUSION*

**\*9** For the foregoing reasons, the motion for summary judgment (**document no. 57**) is GRANTED in part and DENIED in part. The motion is granted with respect to statutory violation of the FMLA and the plaintiff's job application for the position on O'Brien 1, but is denied with respect to the remaining claims.

It is so ordered.

All Citations

Not Reported in F.Supp.2d, 2008 WL 8920318

Footnotes

1. It is undisputed that no one at St. Mary's ever made a discriminatory statement to Mucci concerning her age.
2. Mucci was considered a "new graduate" for the purposes of her hiring as an registered nurse.
3. Mucci had cervical injuries and a torn rotator cuff in her right shoulder.
4. In a letter dated January 11, 2005, John Jenusaitis, St. Mary's Manager of Compensation and Benefits, wrote Mucci that her FMLA leave was exhausted on January 9, 2005. Mucci contends that the letter was postmarked on January 18, 2005 and she received it on January 22, 2005. Jenusaitis wrote in part: "Since you are still unable to return to work and are not eligible for any additional leave the Hospital will place you in a neutral absence status for up to one year (retroactive to the first day of your approved FMA). Neutral absence status means that your former position with the Hospital will no longer be held open. You may apply for any other position within the Hospital, for which you meet the minimum qualifications, once you are cleared to return to work. If you are not cleared to return or have not secured another position by September 14, 2005, the Hospital will terminate your employment as of that date ... During the neutral absence period you are allowed to remain in the Hospital's life insurance plan at no additional cost to you ...."
5. The neutral absence policy in effect at the time provided in part: "It is the policy of the Hospital to place an employee in a neutral absence status once he/she has used the maximum amount of Family and Medical leave, and is unable to return to work due to the ... serious health condition of the employee...."
6. The neutral absence policy in effect at the time provided that "[a]ny employee who is cleared to return to work ... may apply for any open positions for which h/she meets the minimum qualifications. It is the employee's responsibility to check for open positions with the Hospital." St. Mary's argues that applicants in neutral status are considered external applicants. Mucci argues that St. Mary's was not clear about their interpretation resulting in various supervisors providing her conflicting information, which thus affected the weight given to her applications.
7. "An employee must be cleared to return to work by both his/her own physician and the St. Mary's Hospital Occupational Health Physician from their own illness...." St. Mary's 2002 Neutral Absence Policy.
8. As Clinical Recruiter, Miko's responsibilities include preparing, distributing and overseeing all clinical job announcements and recruitment notices, recruiting for a variety of clinical positions including registered nurses, and posting and reviewing all internal transfer requests submitted by clinical employees as well as reviewing all job applications submitted by external candidates for clinical positions. After reviewing the internal and external applications, she distributes them to the nursing director. Miko's review includes a preliminary screening of the applications keeping in mind what the nursing directors are looking for. She also testified that she worked on several reports looking at the issue of the aging nursing workforce out of a concern that there is a lack of replacement nurses for those that are retiring. She expressed concern over a statewide nursing crisis and that the average age of nurses at St. Mary's at the time was 47. In response to a question regarding the hospital specifying nursing positions for new grads that are nontraditional students as a way to ameliorate the aging nursing population, Miko testified "If we're talking about an average age of 35 versus retirement age of 55, 57, that is 20 solid years."
9. The job posting policy in effect at the time provided in part: "All jobs, except executive management level positions, are posted for the benefit of St. Mary's Hospital employees on the bulletin boards located outside the Employees' Dining Room of the Hospital. Available positions are posted on this board for seven consecutive days, beginning with the date of the posting. (See Internal Promotion/Transfer Policy) ... No internal and external candidates will be interviewed until the position has been posted for seven(7) days. Interview dates may be assigned to commence as soon as the posting period is complete."

    Mucci contends that Kathy Pohorilak, an internal candidate, was interviewed and offered the Xavier 3 position during the 7–day posting period contrary to the job posting policy while St. Mary's contends that Ms. Weber officially offered Ms. Pohorilak the position on Xavier 3 "at the end" of the 7–day posting period.

Mucci v. St. Mary's Hosp., Inc., Not Reported in F.Supp.2d (2008)
2008 WL 8920318

10    Mucci applied for 16 positions by way of 7 applications for rehire. She applied for two positions on Xavier 3. She applied for six positions on the Telemetry/Critical Care Unit. She applied for five positions on Sacred Heart 5, one position on O'Brien 1, and two positions on O'Brien 4. The parties dispute whether St. Mary's received one of Mucci's applications (for two positions on Sacred Heart 5) submitted on March 11, 2005. Also, Weber testified that she did not receive Mucci's application for a position on Xavier 3 (submitted on June 13, 2005) from Nancy Miko.

11    In a letter dated September 19, 2005, John Jenusaitis wrote: "This letter is a follow up to the letter sent to you on January 11, 2005, which put you in neutral absence status. As stated in that letter, if you did not secure another position by September 16, 2005, the Hospital will terminate your position as of that date, under the neutral absence policy."

12    St. Mary's additionally argues that Mucci cannot prevail on her claim that the hospital violated the FMLA. Mucci asserts that "[she] never brought a claim under the substantive guarantees of the FMLA, but has asserted a claim of retaliation for exercising those rights." Mucci does not contend that the defendant violated her rights under the substantive terms of the FMLA, and, therefore, the motion for summary judgment is granted with respect to any such claim.

13    CFEPA and ADEA claims are analyzed under the same legal standard, and Connecticut courts use federal precedent as a guide when interpreting and enforcing the CFEPA. See *Levy v. Comm'n of Human Rights and Opportunities*, 236 Conn. 96, 103, 671 A.2d (Conn .1996).

14    St. Mary's argues that May 18, 2005, the date Mucci' filed charges with the CHRO and EEOC, is the date from which her retaliation claim should be analyzed. However, Mucci argues that her first protected activity was an informal complaint made on February 22, 2005, to Diane Gaborc. In viewing the evidence in a light most favorable to the plaintiff, the court concludes that Feb 22, 2005, is the date of Mucci's first protected activity. See *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir.1992) (holding that an "internal complaint to company management" constitutes a protected activity).

15    See also *Alston v. New York City Transit Auth.*, 14 F.Supp.2d 308, 311 (S.D.N.Y.1998) (recognizing that the "plaintiff need not show that individual decision-makers within the NYCTA knew that she had filed ... [an] EEOC complaint."); *Gordon v. Health and Hospitals Corporation*, 2008 WL 924756 (E.D.N.Y.2008)(holding that the defendant's "general corporate knowledge of plaintiff's SDHR complaint" was sufficient knowledge).

16    Compare *Slattery v. Swiss Reinsurance America Corp.*, 248 F .3d 87, 94 (2d Cir.2001)(stating that "adverse employment actions were both part, and the ultimate product of an extensive period of progressive discipline which began when [the defendant] diminished Slattery's job responsibilities a full five months prior to his filing of the EEOC charges."); *Ungerleider v. Fleet Mortgage Croup of Fleet Bank*, 329 F.Supp.2d 343 (2004)(holding that "ample evidence" that plaintiff was not a "model employee" precluded temporal proximity as the sole causal connection); *Milde v. The Housing Authority of the Town of Greenwich et al.*, 2005 U.S. Dist. LEXIS 434701 (holding that a "series of gradual reprimands" prior to the plaintiff engaging in a protected activity outweighs a temporal proximity).

17    The parties do not dispute that St. Mary's has satisfied its burden under the *McDonnell–Douglas* requirement that the defendant proffer legitimate non-discriminatory reasons for not selecting Mucci for the vacant positions.

18    The remaining two options Weber could have selected were "Does Not Met Standard" or "In Training".

---

**End of Document**          © 2017 Thomson Reuters. No claim to original U.S. Government Works.